**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**


SCOTT SYZAK,

                    Petitioner,                Case Number: 2:15-CV-10658

                                                HON. ARTHUR J. TARNOW

v.

RANDY HAAS,

                    Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING A CERTIFICATE OF APPEALABILITY

      Petitioner Scott Syzak, a prisoner in the custody of the Michigan Department of

Corrections, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Petitioner challenges his first-degree felony murder conviction on the grounds that the

trial court erred in denying a motion to suppress expert witness testimony and the trial

court admitted Petitioner's custodial statement in violation of his Fifth Amendment rights.

Respondent, through the Attorney General's Office, has filed an answer in opposition to

the petition arguing that the claims are meritless. For the reasons discussed, the Court

will deny habeas corpus relief.

## I.    Background

      Petitioner's conviction arose from the death of Petitioner's four-month-old

daughter Jessica, on October 12, 1995. Jessica sustained a skull fracture and cerebral

contusion several weeks before her death. Dr. Richard Anderson, the medical examiner

who performed an autopsy, determined that these injuries were the cause of Jessica's death. During the initial investigation, Jessica's mother, Candace Syzak, claimed responsibility for the fall that caused Jessica's head injury. Syzak told authorities that she accidentally dropped Jessica while bathing her. The investigation did not result in Petitioner's arrest until August 2010, when police re-interviewed Petitioner and Candace. Petitioner was interviewed on August 25 and 26, 2010 in his then home state of Indiana. He filed a pre-trial motion to suppress the second interrogation. Following a hearing, the trial court denied the motion.

At trial, Candace Syzak, Jessica's mother, testified that Jessica was born on May 31, 1995. One day in August 1995, when Candace returned home from work, Jessica, who had been alone with Petitioner all day, had a bump on her forehead. When Candace asked Petitioner about the bump, Petitioner said that she kicked away from him when he was bathing her and she hit her head on the bathtub's faucet. Candace and Petitioner waited two weeks to take Jessica to the hospital. Candace testified that, before taking Jessica for medical treatment, they discussed what they would tell medical personnel. Petitioner asked Candace to tell police that she had dropped Jessica. She agreed to do so because she knew that Petitioner had previously gone to prison for assault. At the time, she did not know that his previous conviction involved a child.

Jessica was kept over night at a hospital in Saginaw. When she was released the next day, Candace and Petitioner were told to follow up with Dr. Gerald Schell. The Syzaks took Jessica to Dr. Schell approximately one week later, on October 11, 1995. He

drained Jessica's bump and sent her home. That evening, Jessica woke up at approximately 2:00 a.m., and Petitioner went to check on her. Candace woke up at approximately 6:30 a.m. and, when she went to check on Jessica, found her lifeless in the playpen where she had slept. Jessica's playpen had a blanket and comforter in it.

Cocette Blay testified that she and Petitioner dated in the 1980s, when she was a teenager. At some point in time, Petitioner was permitted to live with her and her family. In March 1989, Blay came home one day to find Petitioner standing on the front lawn crying. He said that the baby (Blay's younger sister Candy) had been hurt. Petitioner reported that Candy had fallen off the couch and landed on some toys. Eventually, Candy was taken for medical treatment and Michigan State Police conducted an investigation. Petitioner was charged with child abuse. Petitioner told Blay that his attorney had told him he faced 12 years in prison, so they needed to leave the state. Blay agreed to move to Florida with Petitioner. After they moved to Florida, they had a child together, Alisha Syzak. In September 1990, when Alisha was about one month old, Blay was taking a bath when she heard Alisha crying from the other room. Alisha ran into the room and found Alisha's foot swelling and bruising. Petitioner, who had been alone with Alisha, told Blay that he had just been playing with Alisha. They decided to take Alisha to the hospital. On the way there, Petitioner told Blay to tell medical personnel that she had dropped Alisha in the bathtub because he was already in trouble regarding Candy. Petitoiner also told Blay to give hospital personnel a false name for him. At the hospital, they discovered that Alisha's leg was broken. Ultimately, police discovered Petitioner's

3

true identity and he was extradited to Michigan. Petitioner pleaded no contest to second-degree child abuse and was imprisoned in Michigan. After that time, Blay and Petitioner did not continue their romantic relationship. When Blay learned what happened to Jessica, she wrote a letter to the prosecuting attorney to inform him that the story about the baby falling in the bathroom had previously been used by Petitioner when Alisha had been hurt.

Dr. Anderson, who performed the autopsy, identified the cause of death as skull fracture and cerebral contusion. He did not believe these injuries were consistent with a fall from several feet. Dr. Anderson found evidence of nine posterior rib fractures. During the autopsy, Dr. Anderson took several tissue samples and prepared slides. After Jessica's body had been released to a funeral home, Dr. Anderson consulted Dr. Werner Spitz, a noted forensic pathologist, regarding the case. At Dr. Spitz's suggestion, he had Jessica's body returned from the funeral home to allow him to take samples from her eyes and from the broken ribs. Dr. Anderson testified that he did not obtain records from Dr. Schell or any hospital before completing the autopsy report. None of the physical slides of the tissue samples taken during the autopsy were available at the time of trial. On cross-emanation, Dr. Anderson admitted that evidence of eye hemorrhages and rib fractures possibly signified Shaken Baby Syndrome. He also testified that he could not rule out asphyxiation as a cause of death. He found no evidence of subdural hematoma, intercranial bleeding or brain stem involvement.

The defense presented a single witness, Dr. Brian Woodruf. Dr. Woodruf testified as an expert in pediatric neurology. He testified that Jessica did not die as a result of a skull fracture or injury to her brain. He found no medical support for the theory that Jessica died from a seizure disorder caused by head trauma. Dr. Woodruf could not rule out Sudden Infant Death Syndrome as the cause of Jessica's death. He noted that medically accepted risk factors for SIDS death include sleeping on a soft surface with blankets, comforters or soft stuffed animals in the sleeping area.

## II.     Procedural History

Petitioner was convicted by a jury in St. Clair County Circuit Court of first-degree felony murder. On July 1, 2011, he was sentenced to life imprisonment.

Petitioner filed an appeal of right in the Michigan Court of Appeals challenging the admission of the medical examiner's testimony, the admission of Petitioner's custodial statement, and the prosecution's questioning of three government witnesses. The Michigan Court of Appeals affirmed Petitioner's conviction. *Id.* The Michigan Supreme Court denied Petitioner's application for leave to appeal. *People v. Syzak*, 495 Mich. 899 (Mich. 2013).

Petitioner, through counsel, then filed the pending habeas corpus petition. Respondent has filed an answer and the related Rule 5 materials.

The petition raises these claims:

I.      The state trial court reversibly erred in denying the defense motion to suppress the testimony by Dr. Anderson where the State lost or destroyed evidence of material or exculpatory

5

value to the defense, or lost that evidence through gross negligence, in violation of Mr. Syzak's constitutional due process rights.

II.     The state courts unreasonably applied the controlling United States Supreme Court's precedent in finding that Mr. Syzak's statement to police on the second day of interrogation, following his detention on suicide watch, was the result of a knowing, voluntary, and intelligent waiver of his Fifth Amendment rights, and thus the admission of his statements at trial violation due process.

## III.    Standard of Review

This habeas petition is reviewed under the exacting standards set forth in the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132,

110 Stat. 1214 (Apr. 24, 1996).  Under AEDPA, a federal court cannot grant habeas relief

with respect to any claim adjudicated on the merits in a state-court proceeding unless the

state adjudication of the claim either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1), (2).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a

rule that contradicts the governing law set forth in [Supreme Court cases]' or if it

'confronts a set of facts that are materially indistinguishable from a decision of [the

Supreme] Court and nevertheless arrives at a result different from [this] precedent.'"

*Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam), quoting *Williams v. Taylor*,

529 U.S. 362, 405-06 (2000). "[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S.86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87 (internal quotation omitted). To obtain relief under § 2254(d)(2), a petitioner must show an unreasonable determination of fact *and* that the resulting state court decision was "based on" that unreasonable determination. *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2012).

Lastly, a federal habeas court must presume the correctness of state court factual determinations. See 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

## IV.    Discussion

### A.    Medical Examiner's Testimony

Petitioner's first claim concerns the admission of Dr. Richard Anderson's testimony. The medical examiner's office failed to preserve slides of tissue and other samples taken during the 1995 autopsy, which prevented Petitioner from retaining an expert to perform an independent analysis of the samples. He argues that admission of Dr. Anderson's testimony violated his right to due process.

Dr. Anderson performed the autopsy of Jessica Syzak on October 12, 1995, the morning of her death. Dr. Anderson was qualified to testify as an expert in pathology, but not forensic pathology because he was not board certified in that sub-specialty. Dr. Anderson first noted that Jessica had a rounded, soft bulge on her head. He performed an internal examination, taking tissue samples for microscopic slides. He also examined the area of Jessica's head where he found the bulge. Under the bulge was a fracture site and an accumulation of fluid. The fracture site showed some signs of healing, so it was not a new injury. The brain located underneath the fracture site showed liquefication of the brain tissue. He found nine posterior rib fractures. Following the autopsy, Dr. Anderson consulted Dr. Werner Spitz, who was known to Dr. Anderson to be a respected forensic pathologist, to inquire whether any further examinations should be performed. Dr. Spitz suggested Dr. Anderson remove the victim's eyes to examine the orbital roofs, and remove some of the fracture for documentation. Dr. Anderson followed Dr. Spitz's recommendations. Dr. Anderson concluded that Jessica's cause of death was skull

fracture and cerebral contusion.  He surmised that the mechanism of death may have been

a posttraumatic seizure.  Dr. Anderson testified that, although he struggled with

determining a mechanism of death, he was certain that the cause of death was a skull

fracture and cerebral contusion.

On cross-examination, Dr. Anderson testified that he did not obtain medical

records from the neurosurgeon who treated Jessica prior to her death nor did he receive

records from the hospital where Jessica was first seen.  He did not obtain any medical

records from Jessica's medical treatments from her head injury.  Dr. Anderson took these

slides: a biopsy of the brain cyst; a biopsy of the eyes; a sample of the fractured ribs; and

biopsies of the lungs, heart, liver, pancreas, kidneys, uterus, and intestines.

The Due Process Clause requires that the State disclose to criminal defendants

"evidence that is either material to the guilt of the defendant or relevant to the punishment

to be imposed."  *California v. Trombetta*, 467 U.S. 479, 485 (1984).  "Separate tests are

applied to determine whether the government's failure to preserve evidence rises to the

level of a due process violation in cases where material exculpatory evidence is not

accessible, *see Trombetta*, 467 U.S. at 489, versus cases where 'potentially useful'

evidence is not accessible. *See Arizona v. Youngblood*, 488 U.S. 51, 58 109 S. Ct. 333,

102 L. Ed.2d 281 (1988)."  *United States v. Wright*, 260 F.3d 568, 570-71 (6th Cir. 2001).

A defendant's due process rights are violated where material exculpatory evidence is not

preserved.  *Trombetta*, 467 U.S. at 489.  For evidence to meet the standard of

constitutional materiality, it "must both possess an exculpatory value that was apparent

before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 488-89. The destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith. *See id.* at 488; *Youngblood*, 488 U.S. at 57.

However, "the Due Process Clause requires a different result when . . . deal[ing] with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 56. "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. A habeas petitioner has the burden of establishing that the police acted in bad faith in failing to preserve potentially exculpatory evidence. *See Malcum v. Burt*, 276 F.Supp.2d 664, 683 (E.D. Mich. 2003). In short, to prevail on a destruction-of-evidence claim, a defendant needs to show that the evidence was exculpatory or that the police acted in bad faith. *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004).

The Michigan Court of Appeals found no due process violation. *Syzak*, 2013 WL 1748596 at *2. The state court first determined that the missing slides were merely potentially useful evidence, not material exculpatory evidence. Therefore, the state court placed the burden on Petitioner to establish that the slides were lost or destroyed in bad faith. *Id.* The state court found that Petitioner failed to offer any evidence to satisfy this

burden, and held that the trial court did not err in denying Petitioner's motion to suppress. *Id.*

Petitioner argues that the Michigan Court of Appeals applied the incorrect standard. He argues that bad faith did not need to be established because the evidence "might have been expected to play a significant role" in his defense. *Trombetta*, 467 U.S. at 488. The Court finds that the Michigan Court of Appeals correctly applied the standard articulated in *Youngblood*, and that its application of *Youngblood* was not unreasonable. In *Youngblood*, government officials did not preserve semen samples that could have eliminated the defendant as the perpetrator, but the Supreme Court held that a showing of bad faith was required because "[t]he possibility that the semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality." 488 U.S. at 56 n. *. Just as the semen samples in *Youngblood* were only potentially exculpatory because there was just a possibility that the test results would aid the defense, there was only the *possibility* that review of the missing slides in this case would yield exculpatory evidence. The Michigan Court of Appeals holding that the slides were potentially exculpatory is not unreasonable.

Because the slides contained only potentially useful evidence, Petitioner's claimed due process violation is reviewed under *Youngblood,* which requires a showing that: (1) the State acted in bad faith in failing to preserve the evidence; (2) the exculpatory value of the evidence was apparent before its destruction; and (3) Petitioner would be unable to obtain comparable evidence by other means. *Youngblood,* 488 U.S. at 57. Bad faith is

not shown where the failure to preserve evidence is the result only of negligence. *Id.* at 58 (finding no bad faith where police negligently failed to refrigerate clothing and to perform tests on semen samples). Even gross negligence in failing to preserve potentially exculpatory evidence does not satisfy the bad faith requirement. *United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001). Petitioner presents no evidence of bad faith. The state court's rejection of Petitioner's claim was not contrary to or an unreasonable application of clearly established Supreme Court law.

**B.     Petitioner's Custodial Statement**

Petitioner next argues that the trial court erred in denying Petitioner's custodial statement, given on August 26, 2010. He argues that his statement was involuntary and unknowing as a result of his "extreme mental state" and the prolonged interrogation. Pet. at 37.

The trial court conducted an evidentiary hearing pursuant to *People v. Walker*, 374 Mich. 331 (1965),[1] to determine the voluntariness of Petitioner's statement to police. Dennis Eaton testified that he was employed as a deputy commander with the Lake County, Indiana Sheriff's Department. In August 2010, the Port Huron Police Department requested his department's assistance in a cold case investigation into the death of Jessica Syzak in 1995.

---

[1] *People v. Walker*, 374 Mich. 331 (1965) requires that an evidentiary hearing be conducted when a defendant challenges the admissibility of a confession.

On August 24, 2010, a detective left a card at the Syzak's home asking that the Syzaks contact the sheriff's department. The next day, two sheriff's deputies went to Petitioner's home and told him that they wanted to discuss a drive-by shooting that occurred near his home in Indiana. When he arrived at the sheriff's department, Deputy Eaton and Detective Huber informed Petitioner that they wanted to talk to him about his infant daughter's death. Deputy Eaton testified that Petitioner was advised of his *Miranda* rights and given a *Miranda* rights form which he signed. When officers told Petitioner they wanted to talk to him about Jessica's death, he became "somewhat distraught" and showed "some signs of nervousness and stress." 4/15/11 Tr. at 15, ECF No. 9-8, Pg. ID 452. Initially, Petitioner told police his wife Candace dropped Jessica while bathing her. Deputy Eaton testified that, after police told Petitioner they had already talked to Candace, his story morphed from both of them being with Jessica to Petitioner being alone with Jessica when the injury occurred. At first he said he was bathing her in the kitchen sink, then in the bathroom bathtub. Petitioner finally said that, at the conclusion of the bath in the cast iron tub, he was holding Jessica in one hand while putting baby oil on her in the other when he dropped her on the corner of the bathtub. He also admitted that he previously had been involved in an incident where a child was dropped and injured under his care.

At some point during the interview, Petitioner began holding his chest and appeared to be having a panic attack. Deputy Eaton called medics. Medics arrived and advised that Petitioner's blood pressure was normal, respirations were normal and that it

was just anxiety.  At one point, Petitioner got the dry heaves.  Until about midway

through the interview, Deputy Eaton did not believe that Petitioner would be kept

overnight.  In his opinion, Petitioner would have been physically and mentally capable of

driving himself home.  Petitioner also told Deputy Eaton that he felt capable of driving

himself home despite the anxiety.  This turned out to be a non-issue as Deputy Eaton

learned that Michigan asked Indiana to detain Petitioner.  Based upon Petitioner's

numerous statements during the interview that he could not and would not go back to

prison, Deputy Eaton ordered that Petitioner be housed in the medical wing of the County

Jail so that he could be placed on suicide watch.  In that facility an inmate on suicide

watch is stripped of their clothing and monitored by a camera.  Petitioner was housed in

the jail on the evening of August 25th.

Late in the evening on August 26th, Detective Brian Kerrigan and Deputy George

Maschke from the St. Clair County Sheriff's Department arrived for the purpose of

interviewing Petitioner.  When he arrived in the interview room, Petitioner told Deputy

Eaton he was "having an extreme mental breakdown."  *Id.* at 50-51, ECF No. 9-8, Pg. ID

487-88.  He told Deputy Eaton he had been "naked in a room filled with gnats" and had

been unable to sleep.  *Id.* at 51, ECF No. 9-8, Pg. ID 488.  Deputy Eaton testified that

Petitioner attributed his inability to sleep, at least in part, to the many thoughts running

through his head all night.  Deputy Eaton did not view Petitioner's condition as extreme

or conclude that Petitioner's cognitive ability had deteriorated since the previous day.

Port Huron Police Department detective Brian Kerrigan testified that, in August 2010, he was assigned to investigate the 1995 death of Jessica Syzak. In connection with the investigation, he and Deputy Maschke traveled to Indiana to interview the Syzaks. After interviewing Candace Syzak, Detective Kerrigan and Deputy Maschke interviewed Petitioner. To start the interview, Deputy Maschke advised Petitioner of his *Miranda* rights.

At the outset, Petitioner told the detectives that he accidentally dropped Jessica while rubbing baby oil on her after giving her a bath. Petitioner reported that he caught Jessica in his feet, but she hit her head on the bathtub, causing a bump on her head. Candace was at work when he dropped Jessica. Petitioner told police that he and Candace originally said Candace dropped Jessica because he was an ex-con and people would put him back in prison. Petitioner repeatedly mentioned that he knew he was going to be put back in prison. Petitioner told police that, around the time of Jessica's death, he was having a hard time integrating into public life after his incarceration. Candace was the primary caregiver for Jessica. Petitioner tried not to be alone with Jessica because he was afraid of her and his temper.

As the interview progressed, Petitioner admitted that he had been having a bad day and forcefully shoved Jessica to the ground. Petitioner also told police: "I may have used more force than I meant to." *Id.* at 82, ECF No. 9-8, Pg. ID 519. At one point during the interrogation, Petitioner said he wasn't "doing very well at all" and was "confused." *Id.* at 85, ECF No. 9-8, Pg. ID 522. Detective Kerrigan testified that Petitioner was shaking

15

for a few minutes at the beginning of the interview.  Petitioner  expressed confusion during the interview about why the case was being investigated 15 years after Jessica's death, but, Detective Kerrigan testified, Petitioner did not express confusion about the proceedings themselves or his rights.

Finally, Scott Syzak testified about the police interrogations.  He testified first that he told the two detectives who came to his home and asked him to come to the station that he did not want to go with them.  He only decided to go the station when the detectives told him that he would be permitted to drive his own vehicle to the station and drive himself home.  As he was driving to the station, one detective was in a vehicle in front of his car and one behind.  Petitioner was interviewed by Detective Eaton beginning sometime during the afternoon of August 25th.  Petitioner testified that he had not eaten since the previous evening, and had consumed one beer on the 25th.  Petitioner felt "confused" "disoriented" and "tired."  *Id.* at 100-01, ECF No. 9-8, Pg. ID 537-38.  He only vaguely remembered bits and pieces of the interview.  Petitioner testified that he took medication for an anxiety disorder.  He had no recollection of being seen by medics during the first interview, but did recall feeling sick to his stomach and dry heaving. When he learned that he was not going to be able to go home that night, he felt "physically and emotionally drained."  *Id.* at 101, ECF No. 9-8, Pg. ID 538.

Petitioner described his confinement on the medical floor of the jail as subjecting him to "abnormal conditions."  *Id.* at 113, ECF No. 9-8, Pg. ID 550.  He testified that when he was taken to the medical floor his clothes were taken away and he was put into a

paper hospital gown. He was placed into a six by nine cell with a stainless steel toilet, a

concrete bed and sink. Neither the sink nor the toilet were in working condition and the

cell bore a strong odor of urine and feces. (104). Officers gave him an indestructible

blanket. He vomited in the cell and used his gown to clean it. He testified that he was

naked until someone came to his cell to bring him for his interview with the Port Huron

detectives. His cell contained a call button, but he received no response when he pressed

it. Petitioner was not seen by a doctor, but a nurse did enter his cell at one point during

the night and give him a pill. He did not know what the pill was for. Petitioner was

provided with food but the food fell to the floor so he did not eat it. Petitioner did not

recall talking to Deputy Eaton prior to the second interview or being informed of his

*Miranda* rights by Deputy Maschke. He did not recall informing Deputies Eaton or

Maschke or Detective Kerrigan about the vast majority of the complaints to which he

testified at the *Walker* hearing. He did recall one of the detectives threatening to kill

Petitioner's wife.

Following the *Walker* hearing, the trial court denied Petitioner's motion to

suppress. The trial court summarized the relevant caselaw and then explained the court's

opinion as follows:

> This Court has reviewed the testimony of Deputy Dennis Eaton of the Lake
> County Sheriff's Department, and also the testimony of Detective []
> Kerrigan, ... and also the testimony of the Defendant Scott Syzak. The
> Court has also reviewed three separate DVDs that contained a recording of
> the questioning of the Defendant and the Defendant's statements that
> occurred on August 25, 2010, and also on August 26th, 2010. ... [T]he
> Court reviewed all of those DVDs in their entirety.

... [T]he People have proven by a preponderance of the evidence that the statement given by the Defendant on August 26, 2010 was voluntary, and that it was also knowing and intelligent.

In reaching this conclusion the Court relies upon the testimony of Deputy Eaton and Deputy Kerrigan, which was corroborated by the Court's review of the, of the interviews that were taken of the Defendant and of the statements that the Defendant gave.

The Court is convinced in addition to that statement being voluntary, that the People have proven by a preponderance of the evidence that Defendant's statement was also knowing and intelligent.

There is little question that when Defendant was first brought to the interview room for questioning on the 26th of August, that he was at first in an emotionally distraught state. However, it was also apparent, especially from the ... video recordings ... that once given a coffee and a cigarette, the Defendant calmed down significantly and he was then read his rights. His *Miranda* rights. By the time he was read his *Miranda* rights on the 26th, the state that he was obviously in prior to that had subsided.

It is obvious to the Court from a review of the videotapes that when the Defendant was read his *Miranda* rights on August 26, 2010, that he understood what those rights encompassed and what their waiver entailed. And that at all times he was cognizant that his statements would likely be used against him at trial.

5/3/11 Tr. at 5-7, ECF No. 9-12, Pg. ID 673-75.

The Michigan Court of Appeals also denied this claim, ultimately deferring to the trial court's credibility determination and finding that although Petitioner had been placed on suicide watch prior to giving his statement to police, there was no indication that his statements were coerced or that "his emotional state was so extreme that he could not knowingly and intelligently waive his *Miranda* rights." *Syzak*, 2013 WL 1748596 at *3.

The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). A confession is considered involuntary if: (1) the police extorted the confession by means of coercive activity; (2) the coercion in question was sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne "because of the coercive police activity in question." *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988). The ultimate question is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). Factors to consider include the presence or absence of police coercion (a "crucial element"), length of interrogation, location of interrogation, continuity of interrogation, the suspect's maturity and education, the suspect's physical condition and mental health, and whether the suspect was advised of his or her Miranda rights. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993). A confession may not be deemed involuntary absent coercive police activity. *Connelly*, 479 U.S. at 167 (stating that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause").

The decision of the state court to credit the police officers' testimony and not Petitioner's testimony is "presumed to be correct." 28 U.S.C. § 2254(e)(1); see also *Ramonez v. Berghuis*, 490 F.3d 482, 490-91 (6th Cir. 2007) (noting that § 2254(e)(1) standard of review applies to a state court's credibility determinations in the context of a

19

hearing on a motion to suppress a confession). Petitioner, therefore, bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Petitioner has not satisfied this burden. Certainly there is evidence that Petitioner was under a great deal of stress and that the jail conditions were unpleasant. But, a suspect's "distressed mental state" at the time of questioning does not alone render a statement involuntary. *Poole v. Stewart*, No. 16-1729, 2017 WL 3014000, *3 (6th Cir. July 14, 2017), citing *Connelly,* 479 U.S. at 1164-65. Petitioner has not shown that his stress was beyond that any suspect would experience under those conditions, particularly where he was obviously stunned that the investigation was ongoing so many years after Jessica's death. While Petitioner testified at the *Walker* hearing that he recalled little of either the August 25th or 26th interviews, during those interviews, he asked relevant questions about extradition, potential charges, and probable cause hearings, which indicated an adequate degree of comprehension, lucidity, and rational thought.

The conditions Petitioner experienced during his incarceration on the jail's medical floor undoubtedly were extremely unpleasant. But Petitioner has not shown that these conditions were sufficiently harsh to render his custodial statement involuntary. Petitioner complained to Deputy Eaton about the gnats in his cell but did not mention lack of food or clothing, or the non-functioning toilet and sink. Petitioner did not ask for food before or during the interview. He requested and was provided coffee and a cigarette. The trial court observed that, after these were provided, Petitioner visibly settled down.

In addition, the interview following Petitioner's night on the medical floor was relatively short, approximately one and a half hours.

Considering the totality of these circumstances, the Michigan Court of Appeals' decision that Petitioner's statements were made voluntarily, knowingly, and intelligently was not contrary to or an unreasonable application of federal law.

## V.     Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (citation omitted).

The Court concludes that reasonable jurists could debate its resolution of Petitioner's claims. Thus, the Court grants a COA.

## VI. Conclusion

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED. Furthermore, the Court GRANTS a certificate of appealability on both claims raised in the petition. The Court finds Petitioner may proceed on appeal *in forma pauperis* because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

SO ORDERED.

S/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge

Dated: March 15, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 15, 2018, by electronic and/or ordinary mail.

S/Catherine A. Pickles
Judicial Assistant